## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Jolonda Roberts,

        Plaintiff,

    v.

Park Nicollet Health Services,
Park Nicollet Clinic, and
HealthSystem Minnesota,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 05-2891 ADM/AJB

---

Steven Andrew Smith, Esq. and Robert L. Schug, Esq., Nichols Kaster & Anderson, PLLP, Minneapolis, MN, on behalf of Plaintiff.

Sara Gullickson McGrane, Esq. and Kristine M. Rock, Esq., Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, MN, on behalf of Defendants.

---

## I. INTRODUCTION

On December 18, 2006, oral argument before the undersigned United States District Judge was heard on Defendants Park Nicollet Health Services, Park Nicollet Clinic, and HealthSystem Minnesota's (collectively "Park Nicollet" or "Defendants") Motion for Summary Judgment [Docket No. 11]. In her Complaint [Docket No. 1], Plaintiff Jolonda Roberts ("Roberts") asserts claims for sex discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, as amended by the Pregnancy Discrimination Act of 1978, 42 U.S.C. § 2000e(k), and in violation of the Minnesota Human Rights Act ("MHRA"), Minn. Stat. §§ 363A.03, subd. 42, 363A.08, subd. 2. For the reasons set forth herein, Defendants' Motion for Summary Judgment is granted.

## II.  BACKGROUND[1]

### A.    Roberts's Job Duties

Park Nicollet provides health-related services such as clinical services, inpatient and outpatient hospital services, and emergency care treatment at locations in Minnesota.  Mem. in Opp'n to Mot. for Summ. J. [Docket No. 19] at 2-3.  In September 2004, Park Nicollet hired Roberts, a Certified Medical Assistant ("CMA"), to work at Park Nicollet's clinic in Hopkins, Minnesota.  Roberts Dep. (First Rock Aff. [Docket No. 17] Ex. M; Schug. Aff. [Docket No. 20] Exs. 1, 6-7, 9-12, 20-21) at 8, 11.  Roberts's job duties included rooming patients, giving injections, checking vital signs, and maintaining medical records.  Id. at 11.  Geraldine Lewis ("Lewis"), Site Supervisor of the Hopkins clinic, directly supervised approximately 14 employees at the Hopkins clinic, including Roberts.  Id. at 14; Lewis Dep. (Schug Aff. Ex. 3) at 8-9.  GeorgAnn Thompson ("Thompson"), Clinic Manager, also oversaw Roberts's work.  Roberts Dep. at 17-18.

### B.    Park Nicollet's Attendance Policy and Timekeeping Procedures

Park Nicollet's attendance policy states that "[f]ailure to maintain regular and reliable attendance will result in disciplinary action up to and including termination of employment."  First Rock Aff. Ex. L at 1.  At the Hopkins clinic, employees under Lewis's supervision maintained their own time sheets, which Lewis reviewed and signed before submitting to human resources.  Lewis Dep. at 11.  According to Lewis, keeping track of employees' punctuality was difficult because time clocks were not used.  Id.  Lewis only recorded someone late if she or

---

[1] On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995).

another supervisor personally observed the employee's late arrival.  Id. at 12.  Lewis tracked

employee tardiness in a Microsoft Excel spreadsheet.  Id. at 11-12.  Consistent with directions

from the human resources department, instances of tardiness that were less than ten to fifteen

minutes were usually not reflected on an employee's official time sheet.  Id. at 11.

**C.     Instances When Park Nicollet Records Roberts as Tardy**

Over the four months Roberts worked at Park Nicollet, her supervisors recorded her as

tardy on multiple occasions.  Roberts disputes whether she was late on most of these occasions.

**1.     September 14, 2004 Verbal Warning**

On September 7, 2004, Leeann Leither ("Leither"), a Human Resources Representative at

Park Nicollet, called Roberts to offer her the CMA position and to discuss Roberts's new hire

schedule.  Leither Dep. (Schug. Aff. Ex. 4) at 7, 10; Roberts Dep. at 20-22.  On September 10,

Roberts arrived one hour late for a pre-placement health assessment scheduled to start at 8:00

a.m.  Roberts Dep. Exs. 1, 14.  On September 13, Roberts arrived 15 minutes late for new

employee orientation, which was scheduled to begin at 7:30 a.m.  Id.  On September 14, Roberts

called in sick, but later arrived to work at 12:45 p.m.  Id. Ex. 1.  She missed the morning session

of new employee orientation, which started at 7:45 a.m.  Id. Ex. 14.

On September 14, 2004, Thompson gave Roberts a verbal warning for tardiness.  Id. Ex.

1.  Roberts and Thompson signed a memorandum regarding the verbal warning on September

17.  Id.  Thompson noted that Roberts alleged that Leither gave her incorrect start times for

September 10 and 13.  Id.  On September 18, Roberts wrote a letter to Lewis regarding the

incorrect start times.  Id. Ex. 2.  Additionally, Roberts explained that after meeting with Leither

on September 13, Roberts believed her start time on September 14 was 1:45 p.m.  Id. at 36-37,

Ex. 2.

### 2.      September 29, 2004 Written Warning

On September 29, 2004, Roberts arrived ten minutes late for her shift.  Id. Ex. 3.  In

response, Lewis warned Roberts in writing that failure to arrive on time "could result in further

disciplinary action including termination."  Id.  Roberts admits she was late that day.  Id. at 24-

25.

### 3.      November 29, 2004 Suspension

On November 29, 2004, Roberts was suspended three working days for being late.  Id.

Ex. 5.  The suspension form, signed by Thompson, states:

> Today, 11/29/04, you were tardy 15 mins late.  You were scheduled to be at and ready to
> work by 8AM per the schedule posted last Tuesday, 11/23/04.  You explained that you
> thought you were to work @ 8:30AM when I asked you about your reasoning for being
> late.  As you know, shift start and end times vary according to your work assignment and
> as posted.

Id.  The suspension form also indicates that Roberts had been late on two prior occasions since

the verbal warning, and that on November 2, Lewis had counseled Roberts regarding

punctuality.  Id.  Further, the form warns that "[t]his suspension represents the final stage of

discipline," and that further tardiness "on an on-going basis will result in further disciplinary

action up to and including termination of employment."  Id.

Also on November 29, Thompson met with Roberts, in the presence of Lewis, and

suggested Roberts consider resigning before the situation escalated into a forced termination.

Lewis Dep. at 26.  On December 3, 2004, Roberts wrote a letter to Lewis stating that she would

continue employment at Park Nicollet.  Roberts Dep. Ex. 6.  Roberts's letter also stated:

4

> On the copy of the suspension form dated 11/29/2004 on # 3 you stated that you counseled me on being tardy 2 times since last warning on 9/29/2004. I know that I signed that and I should have read it better but, now that I had time to look over it I would like to ask you if for now if you counsel me or feel I am tardy can you come to me with written documentation so that I would have to sign? Just because if I get in trouble due to my tardiness at least we all have proof that it happen.

Id. At the time, Roberts thought Lewis was falsely accusing her of tardiness. Id. at 31-32. Roberts also alleges Lewis admitted she should not have counted Roberts as late on November 29. Id. at 32. Nevertheless, Roberts understood after the suspension that she could be terminated if she was late again. Id. at 37.

### 4.      Incidents in December 2004

Lewis recorded Roberts as three minutes late on December 6, 2004. Lewis Dep. at 29-30. Roberts denies she was late that day. Roberts Dep. at 73. On December 20, Roberts arrived late because of a snowstorm. Id. at 37. Lewis asked Thompson if Park Nicollet could terminate Roberts, but Thompson decided Roberts should not be terminated since the storm had caused other employees to be tardy also. Id. Ex. 9. Lewis excused Roberts's December 20 tardiness. Lewis Dep. at 33.

Also on December 20, Roberts slipped and fell on ice in front of the Hopkins clinic and injured her left arm and her back. Roberts Dep. at 44; Nordby Dep. (First Rock Aff. Ex. N.; Schug Aff. Exs. 2, 15-16, 18) Ex. 7. Roberts filed a workers' compensation claim the following week. Nordby Dep. Ex. 7.

On December 21, 2004, Lewis typed a note to herself indicating that Roberts was two-and-a-half hours late to work because of a sick child, and that Lewis "again explained [to Roberts] the importance of being on time." Roberts Dep. Ex. 7. Roberts does not recall having a sick child and avers she arrived on time. Id. at 40-41.

**5.      Roberts's Termination in January 2005**

On January 11, 2005, Roberts was scheduled to have an MRI to assist in diagnosis of the injuries sustained in her December 20, 2004 fall.  Id. at 50.  In preparation for the MRI, Roberts took a pregnancy test on the morning of January 10.  Id.; Schug Aff. Ex. 14.  Roberts learned she was pregnant around noon.  Roberts Dep. at 50.  During lunch, Roberts told her colleagues at the clinic that she was pregnant.  Id. at 60; Kemo Dep. (Schug Aff. Ex. 5) at 15-16.

The parties dispute the facts concerning Roberts's disclosure of her pregnancy to Lewis.  According to Roberts, on the afternoon of January 10, Lewis queried her about the upcoming MRI.  Roberts Dep. at 87.  Roberts responded that the MRI needed to be canceled because she was pregnant.  Id. at 113.  Roberts claims Lewis sighed and asked, "What are you going to do about the baby?  Are you and your husband going to keep it?"  Id. at 57, 75, 83.  Roberts responded that she would keep the baby.  Id. at 57.

Lewis claims she did not learn of Roberts's pregnancy until the afternoon of January 11, 2004.  Lewis Dep. at 18.  Lewis testified she asked Roberts "So now what are you going to do?" in reference to Roberts's injury and the scheduled MRI, and not as to any decision relating to Roberts's pregnancy.  Id.

Lewis initiated Roberts's termination on the morning of January 11.  Id. at 33.  Lewis testified that Roberts called Park Nicollet and reported she would arrive late because of traffic.  Id. at 39-40; Roberts Dep. Ex. 9.  Lewis further stated she observed Roberts arrive seven minutes late that morning.  Lewis Dep. at 34.  Roberts testified that she car-pooled with a co-worker, Kouvonyee Kemo ("Kemo"), and that they arrived together and on time.  Roberts Dep. at 115.  Lewis, who was not Kemo's supervisor, Kemo Dep. at 16, testified she did not observe Kemo

arrive with Roberts.  Lewis Dep. at 34.

Shortly after Roberts arrived on January 11, Lewis called Leither to request authority to terminate Roberts.  Id. at 33-34.  Lewis testified she was unaware of Roberts's pregnancy when she contacted Leither.  Id. at 36.  Leither indicated she believed termination was proper, but that she wanted to consult with Mark Nordby ("Nordby"), Park Nicollet's Employee Relations Manager.  Id. at 35-36.  At 11:43 a.m., Leither emailed Nordby that Lewis "would like to Term Jolanda [sic] Roberts.  Since Jolanda has started with PN she has very excessive tardiness and on 11/29/04 she was suspended.  Since then she has been late 12/6/04 3 minutes, 12/20 1 ½ hours, and 1/11/05 7 minutes."  Nordby Dep. Ex. 6.  Five minutes later, Nordby responded that he had reviewed Park Nicollet's Electronic Documentation System ("EDS") file on Roberts and agreed she could be terminated.  Id.

On the afternoon of January 11, Leither informed Lewis that Roberts could be terminated.  Leither Dep. at 23; Lewis Dep. at 37.  Lewis was busy, so she waited until the morning of January 12 to terminate Roberts.  Lewis Dep. at 37.  Roberts testified that she and Lewis discussed Roberts's workers' compensation issues and pregnancy, and then Lewis said "you were kind of late a couple of days here and because of everything, we have to let you go." Roberts Dep. at 79.  Roberts construed Lewis's reference to "everything" to include her pregnancy.  Id.  Lewis testified that she and Roberts did not discuss Roberts's pregnancy or workers' compensation claim that morning.  Lewis Dep. at 38.

**D.     Roberts Contacts Human Resources**

On the afternoon of January 12, 2005, Roberts met with Nordby because she felt she had been unfairly terminated.  Roberts Dep. at 63; Nordby Dep. at 41.  Roberts claimed Lewis told

her she was late on December 20 and 28, 2004,[2] but that she was not late on those days.  Roberts

Dep. at 68-69, Ex. 10; Nordby Dep. at 38.  Roberts also told Nordby she was not late on January

11.  Roberts Dep. Ex. 9.  Nordby emailed Lewis, who responded that she informed Roberts of

instances of tardiness that occurred on "December 6th (3 minutes), December 20th (1.5 hours),

and January 11th (7 minutes)."  Id.  In a letter dated January 17, 2005, Nordby informed Roberts

that based on her "pattern of tardiness and the warnings that had already been received it is my

position that the termination was the appropriate action and was for the right reasons."  Id. Ex.

10.  Nordby's letter specified that Roberts was recorded as tardy on December 6 and 20, 2004,

and January 11, 2005.  Id.

**E.     Roberts's EEOC Charge; the Complaint**

Roberts filed a Charge of Discrimination with the United States Equal Employment

Opportunity Commission ("EEOC") on September 30, 2005.  Second Rock Aff. [Docket No. 23]

Ex. A.  The Charge specifies that Roberts informed Lewis of her pregnancy on January 11, 2005.

Id.  Roberts filed her Complaint in this action on December 13, 2005, alleging that Park Nicollet

discriminated on the basis of her pregnancy, in violation of Title VII and the MHRA.  The

Complaint also states Roberts informed Lewis of her pregnancy on January 11, 2005, rather than

January 10 as she now asserts.  Compl. ¶¶ 11-15.

---

[2] Park Nicollet's brief asserts that Roberts was late on December 28, 2004.  See Mem. in
Supp. of Mot. for Summ. J. at 12.  However, there is no evidence that Roberts was late that day.
Instead, the record shows that Lewis sent Roberts home early on December 28 because Roberts
was experiencing pain as a result of her fall on December 20, 2004.  See Nordby Dep. at 56, 59.

# III. DISCUSSION

## A.      Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party.  Ludwig, 54 F.3d at 470.  The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial."  Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## B.      Defendants' Motion for Summary Judgment

Title VII and the MHRA both make it an unlawful employment practice for an employer, on the basis of sex, to discharge an employee, or discriminate against a person with respect to compensation, terms, conditions, or privileges of employment.  42 U.S.C. § 2000e-2(a)(1); Minn. Stat. § 363A.08, subd. 2.  Both statutes also similarly define "sex" to include pregnancy, childbirth, or related medical conditions.  42 U.S.C. § 2000e(k); see Minn. Stat. § 363A.03, subd. 42.[3]  In the instant case, the parties agree Roberts's pregnancy discrimination claims

---

[3] Minn. Stat. § 363A.03, subd. 42 defines "sex" to include pregnancy, childbirth, and disabilities related to pregnancy or childbirth.

should be analyzed under the McDonnell Douglas burden-shifting framework.[4]  Holthaus v.

Compton & Sons, Inc., 514 F.2d 651, 652 (8th Cir. 1975), citing McDonnell Douglas Corp. v.

Green, 411 U.S. 792 (1973).  First, Roberts must establish a *prima facie* case of discrimination

by showing that (1) she was a member of a protected class, (2) she was qualified for her position,

and (3) she suffered an adverse employment action under circumstances giving rise to an

inference of discrimination.  Bergstrom-Ek, 153 F.3d at 857.  The burden then shifts to Park

Nicollet to establish a legitimate, nondiscriminatory reason for the alleged discriminatory action.

Id.  If Park Nicollet meets this burden, then Roberts must show that the legitimate reason

asserted by Park Nicollet is merely a pretext for discrimination.  Id. at 857-58.

### 1.    *Prima Facie* Case

Park Nicollet concedes that Roberts was pregnant at the time of her discharge and

therefore was a member of a protected class.  However, Park Nicollet argues that Roberts was

not qualified for the CMA position, and that Roberts was not discharged under circumstances

giving rise to an inference of discrimination.  These arguments are unavailing.

### a.    Whether Roberts was Qualified to Work as a CMA

The Eighth Circuit in Whitley v. Peer Review Systems, Inc., 221 F.3d 1053, 1055 (8th

Cir. 2000), stated that for a plaintiff to show she was qualified, she "must demonstrate that she

was actually performing her job at a level that met her employer's legitimate expectations."  Park

Nicollet argues that Roberts can not show she was qualified under this standard because she

failed to meet Park Nicollet's legitimate expectation that she arrive at work on time.

_____

[4] The same standard is used to analyze both Title VII and MHRA claims, and therefore, the above stated analysis applies to both claims.  See Bergstrom-Ek v. Best Oil Co., 153 F.3d 851, 857 (8th Cir. 1998).

At oral argument, Roberts argued that the legitimate expectations test no longer governs after the Eighth Circuit's decision in <u>Arnold v. Nursing and Rehabilitation Center at Good Shepherd, LLC</u>, 471 F.3d 843 (8th Cir. 2006). Arnold, a licensed practical nurse, claimed she was fired because of her race. <u>Arnold</u>, 471 F.3d at 845. In granting summary judgment, the district court found that Arnold could not show she was qualified because "there exists no evidence that [Good Shepherd] did not have a good faith belief that [Arnold] was not performing her duties satisfactorily." <u>Id.</u> at 846 (insertions in original). Although the Eighth Circuit affirmed summary judgment on other grounds, it held that the district court's conclusion that Arnold was unqualified was mistaken, because "[b]y requiring Arnold to prove that she executed her duties satisfactorily, the district court 'raised the standard set by the Supreme Court for what suffices to show qualification.'" <u>Id.</u>, quoting <u>Slattery v. Swiss Reinsurance Am. Corp.</u>, 248 F.3d 87, 91 (2d Cir. 2001). Instead, the Eighth Circuit found it "undisputed that Arnold was qualified to serve as a licensed practical nurse. Arnold had served as a licensed practical nurse for nearly a year before her discharge." <u>Id.</u>

<u>Arnold</u> cites the Second Circuit's opinion in <u>Slattery</u>, which explains that "[t]he qualification prong must not . . . be interpreted in such a way as to shift onto the plaintiff an obligation to anticipate and disprove, in his *prima facie* case, the employer's proffer of a legitimate, non-discriminatory basis for its decision." <u>Slattery</u>, 248 F.3d at 92. Instead,

> [T]he qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he "possesses the basic skills necessary for performance of [the] job." As a result, especially where discharge is at issue and the employer has already hired the employee, the inference of minimal qualification is not difficult to draw.

<u>Id.</u> (citation omitted).

This Court finds that under <u>Arnold</u>, the relevant inquiry for the qualification prong of Roberts's *prima facie* showing is not whether Roberts met Park Nicollet's legitimate expectations, but whether she possessed the basic skills necessary to perform as a CMA. Roberts was a licensed CMA, Park Nicollet hired her, and Lewis testified Roberts's job performance was average.  Lewis Dep. at 13.  Roberts has satisfied the qualification requirement.

> **b.     Inference of Discrimination**

To prove that her January 12, 2005 termination occurred under circumstances giving rise to an inference of discrimination, Roberts cites her deposition testimony that she informed Lewis of her pregnancy on the afternoon of January 10, and that Lewis asked her if she would keep the baby.  Roberts argues that the close temporal proximity between her disclosure to Lewis on the afternoon of January 10 and Lewis's decision to terminate Roberts the next morning gives rise to an inference that Roberts was terminated because of her pregnancy.

In response, Park Nicollet argues that Roberts's deposition testimony regarding Lewis's inappropriate remarks is inadmissible hearsay.  "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  Fed. R. Evid. 801(c).  Here, Roberts cites Lewis's alleged statements to prove that the statements were made, and not to prove the truth of anything asserted in those statements.  Therefore, Roberts's account of Lewis's alleged remarks on January 10 is not hearsay.

Park Nicollet also argues that Roberts's deposition testimony that she disclosed her pregnancy to Lewis on January 10, 2005, should not be considered because it contradicts Roberts's prior sworn statement in her EEOC Charge and the allegations in her Complaint,

which identify January 11 as the date Roberts first informed Lewis of her pregnancy.  In essence,

Park Nicollet argues that Roberts's deposition testimony creates a sham issue of fact.

In response, Roberts contends that specifying January 11 as the date of the pregnancy

conversation in the EEOC Charge and the Complaint was a mistake that she corrected at her

deposition.  Mem. in Opp'n to Mot. for Summ. J. at 24-25.  To support her argument, Roberts

cites an application for unemployment benefits she submitted on February 22, 2005, which states

in part:

> Due to the news of the pregnancy that day 01/10/2005 I had to cancel the MRI
> appointment.  My supervisor and I worked so hard on making that appointment and since
> I wasn't able to attend I had to inform her of my condition and the reason why that
> afternoon.  Again 2 days later I was terminated.

Roberts Dep. Ex. 11.

In support of its argument that Roberts's deposition testimony changing the date she

disclosed her pregnancy should be disregarded, Park Nicollet relies on Camfield Tires, Inc. v.

Michelin Tire Corp., 719 F.2d 1361, 1365-66 (8th Cir. 1983), where the Eighth Circuit held that

a party can not defeat summary judgment by creating a sham issue of fact in an affidavit that

contradicts the party's prior deposition testimony.  Roberts has not submitted an affidavit on

summary judgment that contradicts her deposition testimony, thus Camfield is distinguishable.

Although the inconsistency between the January 11, 2005 date listed in Roberts's EEOC Charge

and her Complaint, and the January 10 date she testified to in her deposition testimony, is

troubling, the February 2005 application lends some support to Roberts's explanation that both

the EEOC Charge and the Complaint bear an incorrect date.  Thus, although the discrepancies

weaken Roberts's credibility, Roberts's deposition testimony that she told Lewis of her

pregnancy on January 10 will be considered for purposes of summary judgment.  Viewed in the

requisite light most favorable to Roberts, the timing of Lewis's decision to terminate Roberts, along with Lewis's alleged comments, give rise to an inference that Roberts was fired because of her pregnancy.

### 2.   Pretext[5]

There are at least two ways a plaintiff can establish a question of fact regarding pretext. Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120 (8th Cir. 2006).  First, a plaintiff can indirectly show pretext with evidence that the employer's explanation is "'unworthy of credence' because it has 'no basis in fact.'"  Wallace, 442 F.3d at 1120, quoting Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256 (1981), and Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002).  Second, a plaintiff can directly show pretext "'by persuading the court that a [prohibited] reason more likely motivated the employer.'"  Id. (insertion in original), quoting Burdine, 450 U.S. at 256.  Roberts contends she has sufficient evidence of pretext to raise a question of fact on both the direct and indirect showings referred to in Wallace.

### a.   Whether Park Nicollet Had a Factual Basis for Terminating Roberts

The indirect showing of pretext "usually involves more than a rebuttal of the employer's ultimate claims regarding its subjective motives.  It typically involves a broader rebuttal of the employer's underlying factual claims."  Id.  To support her argument that Park Nicollet had no factual basis for discharging her, Roberts refers to her deposition testimony that she was not late on two of the three dates—December 6, 2004 and January 11, 2005—mentioned in Nordby's January 17, 2005 letter, and that her tardiness on December 20, 2004 was excused because of the

---

[5] Roberts does not dispute that tardiness is a legitimate, nondiscriminatory reason for Park Nicollet to terminate her.  Accordingly, pretext will be next considered.

snowstorm.

Although a factual dispute exists regarding whether Roberts was tardy on these dates, this fact dispute, by itself, can not support a finding of pretext because "[a] proffered, non-discriminatory reason for termination need not, in the end, be correct if the employer honestly believed the asserted grounds at the time of the termination." Twymon v. Wells Fargo & Co., 462 F.3d 925, 935 (8th Cir. 2006). Here, Park Nicollet terminated Roberts because of a pattern of tardiness beginning in her first week of employment that resulted in her suspension, combined with the fact that she was reportedly tardy yet again after her suspension. Roberts's attempt to show Park Nicollet had no factual basis for discharging her fails because the fact dispute regarding Roberts's alleged tardiness in December 2004 and January 2005 can not overcome the fact that Roberts was already on thin ice after she was suspended on November 29, 2004, long before Roberts discovered she was pregnant. Although Roberts disputes nearly every instance of tardiness leading up to her suspension, there is no evidence that Lewis and Thompson did not believe in good faith that Roberts had a serious tardiness problem that warranted dismissal. In fact, the evidence shows otherwise, since Thompson had recommended that Roberts consider resigning before the situation escalated into a forced termination. Moreover, Lewis and Thompson had discussed terminating Roberts on December 20, 2004, over twenty days before Roberts learned she was pregnant. Roberts can not show that Park Nicollet lacked a factual basis for terminating her because of tardiness.

**b.    Whether Pregnancy Discrimination More Likely Motivated Park Nicollet**

The direct showing of pretext referred to in Wallace "does not necessarily involve disproving the underlying factual claims of the employer." Wallace, 442 F.3d at 1121. Instead,

"a plaintiff may concede that the proffered reason . . . *would have been* a sufficient basis for the adverse action while arguing that the employer's proffered reason was not the true reason for the action." Id.  To survive summary judgment, a plaintiff "must adduce enough admissible evidence to raise genuine doubt as to the legitimacy of a defendant's motive, even if that evidence does not directly contradict or disprove a defendant's articulated reasons for its actions." Buettner v. E. Arch Coal Sales Co., Inc., 216 F.3d 707, 717 (8th Cir. 2000).

Roberts contends that even though Park Nicollet was on the verge of terminating her employment for tardiness, she has evidence to show that this reason was pretext, and that a prohibited reason, pregnancy discrimination, motivated Park Nicollet's ultimate decision to terminate her.  Stated differently, Roberts claims her pregnancy was the proverbial straw breaking the camel's back.  Roberts's evidence, however, does not raise a genuine issue of fact regarding pretext.  The lynchpin of Roberts's case is her deposition testimony that Lewis made discriminatory comments on January 10 and 12, 2005.  Roberts contends that Lewis's alleged inquiries as to what Roberts was "going to do about the baby" and whether Roberts was "going to keep it" are strong evidence that Lewis decided to fire Roberts because of her pregnancy.  However, although these remarks, if made, were insensitive, they do not show that Lewis was motivated to terminate Roberts because she was pregnant.

Similarly, Lewis's alleged comments on January 12 are not strong evidence of pretext.  Roberts testified that she and Lewis

> Were talking about the workmen's comp, we were talking about the pregnancy . . .we were talking about all the things that come with the pregnancy . . . like, yeah, this would be my third kid, I really wasn't expecting this, you know, and but we're going to have—just talking because that's how we talked.  We talked about that and then she said well, you were kind of late a couple of days here and because of everything, we have to let you go.  That wasn't her exact words, but she said because of this we have to make

this decision.

Roberts Dep. at 79.  Roberts offers these comments to show that Lewis was motivated by Roberts's pregnancy to seek her dismissal.  However, these comments are vague.  Although Roberts construed "because of everything" to include her workers' compensation claim, her pregnancy, and perhaps other concerns, it is far more plausible that "because of everything" referred to the recent instances of tardiness Lewis had recorded, and more broadly to the earlier disciplinary actions taken against Roberts because of her tardiness.  The vague statements Lewis allegedly made on January 12 do not raise genuine doubt as to the legitimacy of Park Nicollet's motive in terminating Roberts.

As evidence of pretext, Roberts also relies on the temporal proximity between her alleged disclosure of her pregnancy to Lewis on January 10, and Lewis's decision to terminate Roberts on January 11.  Although temporal proximity may create an inference of discrimination, the Eighth Circuit has cautioned courts to be "hesitant to find pretext or discrimination on temporal proximity alone."  Quick v. Wal-Mart Stores, Inc., 441 F.3d 606, 610 (8th Cir. 2006) (quotation marks and citation omitted).  Roberts's termination followed verbal and written warnings in September 2004, and a suspension in November 2004, all for tardiness.  She knew that if she was late again, she could be terminated.  Roberts Dep. at 37.

Roberts disputes that she was tardy an additional occasion.  However, with the exception of September 29, 2004 and December 20, 2004, Roberts has disputed every instance when she was recorded as tardy.  By early December, a month before Roberts learned she was pregnant, she believed Lewis was falsely accusing her of being late.  Id. at 31-32.  In light of this disputed history of tardiness, Roberts's protestations that she was not late on December 6, 2004 and

17

January 11, 2005 are not strong evidence of pretext.  Lewis and Roberts already established a history of Lewis recording Roberts as late, and Roberts claiming she was not.

Roberts also argues pretext is shown by the fact that, although she was allegedly late on multiple occasions in December, and was subject to being fired at any time under Park Nicollet's progressive discipline policy, she was not fired until January 12, 2005, after Lewis knew Roberts was pregnant.  Roberts cites language in <u>Wallace</u> that

> Where an employer tolerates an undesirable condition for an extended period of time, an employee takes part in protected conduct, and shortly thereafter, the employer takes an adverse action in purported reliance on the longstanding undesirable condition, a reasonable jury can infer that the adverse action is based on the protected conduct.

<u>Wallace</u>, 442 F.3d at 1122.  The facts in <u>Wallace</u>, however, are readily distinguishable from the instant case.  Fifteen days after Wallace complained of sexual harassment, her employer decided to terminate her.  <u>Id.</u> at 1114.  The employer asserted that the dismissal, which occurred in early May 2002, was due in part to the economic downturn caused by the terrorist attacks on September 11, 2001.  <u>Id.</u> at 1120.  However, since no similarly situated employees were terminated because of the post-September 11 economic downturn, which had persisted for many months, the <u>Wallace</u> court held that the temporal proximity between Wallace's complaint and her termination provided strong support for an inference of retaliation.  <u>Id.</u> at 1116, 1122.

In the instant case, rather than tolerate Roberts's tardiness for an extended period of time, Park Nicollet disciplined her for it.  During Roberts's four-month tenure at Park Nicollet, she was disciplined three times because of tardiness.  Moreover, Thompson suggested that Roberts should consider resigning before the situation escalated into a forced termination.  Further, there is evidence that Lewis and Thompson discussed terminating Roberts on December 20, 2004, but decided against it.  Park Nicollet may have "tolerated" Roberts's alleged tardiness in December

18

2004, when she could have been dismissed.  However, one month is not an extended period of time.  Moreover, this Court does not sit as a super-personnel department, second-guessing business decisions.  Haas v. Kelly Svs., Inc., 409 F.3d 1030, 1036 (8th Cir. 2005).  Park Nicollet "'can certainly choose how to run its business,' including not to follow its personnel policies regarding termination of an employee . . . 'as long as it does not unlawfully discriminate in doing so.'"  Id., quoting Mayer v. Nextel West Corp., 318 F.3d 803, 810 (8th Cir. 2005).  Viewing the record as a whole, Park Nicollet's failure to terminate Roberts in December 2004, and its subsequent reliance on some of the December dates as reasons for discharging Roberts, does not give rise to an inference that Roberts's pregnancy was a motivating factor in Park Nicollet's decision to terminate Roberts.

Finally, Roberts argues similarly situated employees were not reprimanded for tardiness on December 20, 2004 or January 11, 2005 as evidence of pretext.  See Phillips v. Union Pac. R.R. Co., 216 F.3d 703, 706 (8th Cir. 2000) (noting that evidence of disparate treatment can support a finding of pretext when the plaintiff and the more favorably treated party were similarly situated in all relevant respects).  Although Lewis mentioned December 20, 2004 when she terminated Roberts, Lewis did not rely on the date.  Lewis Dep. at 44; Nordby Dep. at 58. Therefore, Roberts was not treated differently from other similarly situated employees. Regarding January 11, 2005, Roberts claims she and Kemo arrived together and yet Kemo was not reprimanded for being late.  However, Lewis did not observe Kemo arrive late.  Further, Roberts and Kemo were not similarly situated because Lewis was not Kemo's supervisor, see Gilmore v. AT&T, 319 F.3d 1042, 1046 (8th Cir. 2003), and Kemo was not in a post-suspension situation.  No inference of pretext arises from the fact that Roberts and Kemo were treated

19

differently.

This record, viewed in the light most favorable to Plaintiff, can not support a finding of pretext.  Therefore, Park Nicollet's Motion for Summary Judgment is granted.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants Park Nicollet Health Services, Park Nicollet Clinic, and HealthSystem Minnesota's Motion for Summary Judgment [Docket No. 11] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  March 15, 2007.